## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| **JOSEPH GILBERT** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| **WILLIS TOWERS WATSON US LLC,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| Serve: Registered Agent CORPORATION | ) | |
| SERVICE COMPANY | ) | |
| 100 Shockoe Slip 2nd FL | ) | |
| Richmond, VA 23219 | ) | |
| | ) | |

## COMPLAINT

**COMES NOW** Plaintiff Joseph Gilbert, by Counsel, and moves this Court for judgment against Defendant Willis Towers Watson US LLC, in the manner and for the reasons set forth below.

## INTRODUCTION

1. Though Defendant could have hired enough Americans at the prevailing wage rate (or lower), Defendant chose to hire foreign nationals on H-1B Visas due to its own internal desire to increase corporate diversity and make in-roads into global markets. Defendant had the right to make such a decision. But Defendant did not have the right to pay for its preferred approach by establishing a lower pay-scale for Americans than for non-Americans. This action violates Title VII's bar against national origin discrimination and is the subject of this lawsuit.

## JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

In addition, the Court has supplemental jurisdiction of Counts III and IV under 28 U.S.C §
1367, as they form part of the same case or controversy.

3.  Venue is proper under 28 U.S.C. § 1391 in the Eastern District of Virginia because all or
substantial part of the events or omissions on which the claims herein are based occurred in
the Eastern District of Virginia.

## PROCEDURAL REQUIREMENTS

4.  On or about September 13, 2019, Mr. Gilbert filed a charge of discrimination with the Equal
Employment Opportunity Commission ("EEOC").  Such charge was filed within 300 days
after one or more of the alleged unlawful employment practices in violation of the Civil Rights
Act had occurred.

5.  On or about May 20, 2021, Mr. Gilbert received a Notice of Right to Sue from the EEOC.  This
notice gave Mr. Gilbert 90 days from the receipt of the notice to file a Complaint based on his
allegations.

## PARTIES

6.  Plaintiff Joseph Gilbert is an experienced actuary with a Bachelor of Arts in mathematics from
the University of Michigan.  He was born in the United States and is a resident of Virginia.

7.  Defendant Willis Towers Watson US LLC ("WTW", "Corporation" or "Defendant") is a
multinational risk management firm, insurance brokerage, and advisory company.  It is
headquartered at 800 N Glebe Road in Arlington, Virginia.  At all times relevant to this cause
of action, Defendant was Mr. Gilbert's employer within the meaning of the Civil Rights Act.

## FACTS

### A.  WTW Use of H-1B Program

8.  WTW is a savvy global corporation that has long used the H-1B Visa ("Visa") program[1] to great effect to keep the wages of its actuarial employees low.

9.  Though the Visa application process costs WTW a significant amount (approximately $6,000 per candidate), utilizing the process allowed WTW to ultimately cut costs because the Department of Labor ("DOL") prevailing wage rate for actuary positions was historically set at a low amount.  The low wage rate permitted the Corporation to claim it could not find enough American applicants at the going rate, to aggressively recruit and hire foreign nationals and to pay all its actuaries the same low wage.

10. In 2017, however, the Trump Administration intentionally challenged many of the prevailing wage rates set by the DOL, including that of actuaries.  The Administration ultimately raised the rate for actuaries by more than 15%.

11. If the decision had been simply financial, WTW would have stopped using the costly Visa system immediately.  But, the Corporation had come to rely upon the program for at least two, and possibly more, ulterior reasons.

12. First, utilization of the system had allowed the Corporation to increase its employee diversity. This became a selling point for the Corporation, making it feel good about itself (i.e. virtue signaling) and more liked in its business communities.

---

[1] The H-1B visa program allows employers "to hire nonimmigrant aliens as workers in specialty occupations."  U.S. Department of Labor, *H-1B Program – Overview*, (June 30, 2021), https://www.dol.gov/agencies/whd/immigration/h1b.  "The intent of the H-1B provisions is to help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States," under specified conditions.  *Id.*

13. Second, as a global corporation the existence of foreign nationals – with concomitant language skills, knowledge of the foreign culture and potential connections – became a useful tool for the Corporation to ingratiate itself with international clients.  This was true especially with Chinese companies, a country where WTW has a significant footprint and a desire to grow.

14. In 2017 the Corporation faced a stark decision: abolish its Visa program and seek to recruit more Americans at a higher rate of pay or continue the Visa program, reap the ulterior benefits noted above, but in return increase the pay of *all* actuaries to the prevailing rate.

15. Not content with either legal option, however, WTW conceived a third way.  It decided to just delay Visa applications[2] for its foreign employees and then, when about to apply for a candidate's Visa, surreptitiously raise that foreign national's compensation to the prevailing rate at that time.

16. This allowed WTW to continue to depress the starting wage for all of its actuary employees, and to secretly bump the foreign nationals pay after their first year of work.

17. Through use of this sly strategy, the Corporation was able to maintain its practice of targeting recruitment at non-U.S. employees, preferring these non-American workers in hiring decisions and paying them more.  Because WTW never disclosed their strategy, it kept its American workers oblivious to the inequitable situation.  (Paragraphs 15-17 collectively referred to as "Employment Practices").

---

[2] Upon information and belief, in 2018 the likelihood of an applicant receiving a Visa was around 30%.  But, most applicants were allowed to apply once every year for three years.  WTW previously would submit a foreign national's application immediately upon employment, but after the prevailing wage increase the Corporation changed the policy to only apply in the second year of an applicant's employment.

**B.  Mr. Gilbert's Employment**

18. Joseph Gilbert was an outstanding employee for the Corporation.  He maintained consistently excellent performance reviews and enjoyed good relationships with international and American colleagues alike during his employment.

19. The Corporation hired Mr. Gilbert on June 13, 2016, with a baseline salary of $58,000.

20. As an actuary at the Corporation, Mr. Gilbert's compensation is ostensibly tied to his completion of professional exams in the actuarial field, as well as performance.

21. As Mr. Gilbert completed his professional exams and garnered performance-based raises, his base compensation rose to approximately $72,000 at the beginning of 2018.

22. At the beginning of 2018 a colleague from China, Qiya Zhang, was making a nearly identical compensation of approximately $72,000. Ms. Zhang had the same job functions, held the same title, possessed the same professional credentials, and had been hired at the same time as Mr. Gilbert.

23. In October of 2018 Mr. Gilbert learned that, to make Ms. Zhang eligible to apply for a Visa, the Corporation had given Ms. Zhang a raise to approximately $83,000 sometime earlier that year. Mr. Gilbert received no such raise and continued making approximately $72,000.

24. Soon thereafter, Mr. Gilbert learned that another colleague from China—Ms. Yajie Bi—who also held the same position, possessed similar professional credentials, was hired about the same time and conducted identical work to Mr. Gilbert was also being paid on this heightened pay rate.

25. Mr. Gilbert never observed a job posting that advertised the wages and positions that his colleagues attained and it was otherwise never disclosed to him by the Corporation.

26. Through further investigation and discussions, it was confirmed to Mr. Gilbert by his superiors that the foreign national employees, like Ms. Zhang and Ms. Bi, were being paid a significantly higher amount than the American employees.

27. WTW's excuse was that it had to pay the non-Americans more to comply with the DOL prevailing wage rates.

28. For the rest of Mr. Gilbert's tenure at the Corporation—until he left in March of 2021—the pay disparity continued to exist and upon information and belief the two-tier pay structure continues to this day at the Corporation.

**C. The Corporation's Unlawful Employment Practices**

29. By using the above Employment Practices, the Corporation intentionally discriminates against American citizens by (a) targeting foreign nationals in the hiring process to depress American workers salaries; (b) paying higher wages to foreign nationals because of preferences for them at the Corporation; and (c) refusing to raise the wages of American-origin workers to match the wages of these foreign nationals.

30. The Corporation's actions also have a disparate impact on those of American national origin by:

    a. depressing the price of labor within Mr. Gilbert's labor market;

    b. leading to fewer people of American origin gaining jobs at the Corporation; and

    c. lowering compensation of American employees, against those of other national origins, at the Corporation.

**D. The Corporation Refuses to Adopt Alternative Employment Practices**

31. This inequity—and the impact on American workers—could have, however, been remedied.

32. As **Alternative Practice 1**, the Corporation could ensure that its hiring practices make all positions fully available to the U.S. workforce—with publicly-posted job descriptions and salaries—*before* seeking jobs on the global labor market through Visa candidates.

33. The money saved by reducing or abolishing the Visa program, could be used by the Corporation to recruit and pay its American origin employees closer to the prevailing wage.

34. Implementing Alternative Practice 1 would result in more U.S.-origin workers being hired and would eliminate the disparate impacts of the challenged Employment Practices.

35. If Alternative Practice 1 were in place, Mr. Gilbert would have earned higher compensation.

36. Alternative Practice 1 would still meet the business purposes of the Corporation and would be equally effective in attaining a competent workforce.

37. In 2019 and 2020, Mr. Gilbert suggested to the Corporation's management to adopt Alternative Practice 1.  The Corporation refused.

38. For **Alternative Practice 2**, the Corporation could compensate all of its employees at comparable rates, including by indexing the payment of all employees to the prevailing wages set by the DOL for actuaries.

39. This would ensure that US-origin employees are not directly disadvantaged by higher average wages for those with non-American national origins.

40. If Alternative Practice 2 were adopted, it would eliminate the disparate impacts of the challenged Employment Practices.

41. Alternative Practice 2 would still meet the business purposes of the Corporation and would be equally effective in attaining a competent workforce with fair and sustainable compensation policies.

42. In 2019 and 2020, Mr. Gilbert repeatedly suggested to the Corporation's management to adopt Alternative Practice 2.  The Corporation refused.

43. The Corporation's refusal to adopt Alternative Practices 1 and 2 is intentional.

44. The Corporation could fulfill its appropriate business objectives, and avoid disparate impact on American workers, by adopting either Alternative Practice 1 or 2.

**E.  Damages**

45. As a direct result of the Corporation's actions, Mr. Gilbert was paid approximately $11,000 per year *less* than similarly qualified actuaries of non-U.S. origin, from 2018 to 2021.

46. When he secured another position as an actuary in Spring 2021, Mr. Gilbert's bargaining position was weakened by his existing compensation scale.  In the absence of the Corporations' illegal employment practices, Mr. Gilbert's current compensation scale would have been higher.

47. As a direct and proximate result of Defendants' conduct, Mr. Gilbert has suffered, continues to suffer, and will in the future suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, lost wages, a reduction in pay, costs of the EEOC procedures, litigation expenses including attorney's fees, accrued interest and other injuries. (collectively "Damages").

### COUNT I: TITLE VII INTENTIONAL DISCRIMINATION

48. Plaintiff hereby incorporates the preceding and subsequent paragraphs of this Complaint by reference in this Count.

49. Under Title VII,[3] it is an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin."  42 U.S.C. § 2000e-2(a)(1).

---

[3] "Title VII", herein, refers to Title VII of the Civil Rights Act of 1964, as amended (see, 42 U.S.C. § 2000e-2 *et seq*).

50. Furthermore, it is an "unlawful employment practice" to "limit, segregate, or classify … employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … national origin." 42 U.S.C. § 2000e-2(a)(2).

51. By use of the Employment Practices, the Corporation has discriminated against Plaintiff regarding the compensation, terms, and conditions of his employment.

52. Plaintiff's national origin was a motivating factor for the Corporation's Employment Practices.

53. But for the Corporation's wrongful Employment Practices, Plaintiff would not have been discriminated against based upon his national origin.

54. As detailed above, Plaintiff has suffered Damages as a result of Defendants' unlawful conduct under Count I.

**WHEREFORE**, on Count I, Plaintiff Joseph Gilbert respectfully requests that this Honorable Court enter judgment in his favor and against Defendant as follows:

a) Back pay (including interest and benefits) in an amount to be determined at trial;

b) Compensatory damages against the Defendant;

c) Plaintiff's attorney's fees, expert fees and costs incurred during and in connection with this matter pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1981a, and/or all other applicable state or federal laws;

d) Equitable relief to address Defendant's actions, including orders to prevent future re-occurrences of this conduct by requiring Defendant to create and follow lawful employment practices, and an order of front pay;

e) An award of punitive damages;

f) Pre- and post-judgment interest on the foregoing amounts; and

g)  Any and all other relief that this Court deems just and proper.

## COUNT II: TITLE VII DISPARATE IMPACT DISCRIMINATION

55. Plaintiff hereby incorporates the preceding and subsequent paragraphs of this Complaint by reference in this Count.

56. Under Title VII, it is an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin."  42 U.S.C. § 2000e-2(a)(1).

57. Furthermore, it is an "unlawful employment practice" to "limit, segregate, or classify … employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … national origin."  42 U.S.C. § 2000e-2(a)(2).

58. Defendant was Mr. Gilbert's employer for all purposes under Title VII.

### A.  Use of Unlawful Employment Practice

59. "An unlawful employment practice based on disparate impact is established . . . if . . . a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of [] national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).

60. By adopting the Employment Practices, the Corporation caused disparate impacts on workers of U.S. origin in violation of Title VII, as detailed above.

61. There is no job-related reason for the Employment Practices.  The Corporation simply prefers to hire foreign workers for ulterior corporate benefits.

62. Nor is the Employment Practice justified by any business necessity.  For example, the Corporation could meet the prevailing wage requirements for Visa applicants, *and* avoid national origin discrimination or disparate impact, by adopting the Alternative Practices described above.

63. As detailed above, Plaintiff has suffered Damages as a result of Defendants' unlawful conduct under Count II.

### B. Refusal to Adopt Alternative Employment Practices

64. "An unlawful employment practice based on disparate impact is established . . . if . . . the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice."  42 U.S.C. § 2000e-2(k)(1)(A)(ii).

65. Defendant was Mr. Gilbert's employer for all purposes under Title VII.

66. By refusing to adopt Alternative Practice 1, the Corporation engaged in an unlawful employment practice under Title VII.

67. By refusing to adopt Alternative Practice 2, the Corporation engaged in an unlawful employment practice under Title VII.

68. Failing to adopt Alternative Practices 1 and 2 has led to an unlawful disparate impact on people with a U.S. national origin, in violation of Title VII §§ 2000e *et seq.*

69. As detailed above, Plaintiff has suffered Damages as a result of Defendants' unlawful conduct under Count II.

**WHEREFORE**, on Counts II(A) and II(B), Plaintiff Joseph Gilbert respectfully requests that this Honorable Court enter judgment in his favor and against Defendant as follows:

a)  Back pay (including interest and benefits) in an amount to be determined at trial;

b)  Compensatory damages against the Defendant;

c)  Plaintiff's attorney's fees, expert fees and costs incurred during and in connection with this matter pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1981a, and/or all other applicable state or federal laws;

d)  Equitable relief to address Defendant's actions, including orders to prevent future re-occurrences of this conduct by requiring Defendant to create and follow lawful employment practices, and an order of front pay;

e)  An award of punitive damages;

f)  Pre- and post-judgment interest on the foregoing amounts; and

g)  Any and all other relief that this Court deems just and proper.

## COUNT III: VIRGINIA INTENTIONAL DISCRIMINATION

70. Plaintiff hereby incorporates the preceding and subsequent paragraphs of this Complaint by reference in this Count.

71. Under the Virginia Human Rights Act, it is an "unlawful employment practice" to "discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's . . . national origin."  Va. Code § 2.2-3905(B).

72. Furthermore, it is an "unlawful employment practice" to "Limit, segregate, or classify employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect an individual's status as an employee, because of such individual's … national origin."  *Id.*

73. Defendant was Mr. Gilbert's employer for all purposes under the Virginia Human Rights Act.

74. By use of the Employment Practices, the Corporation has discriminated against Plaintiff regarding the compensation, terms, and conditions of his employment.

75. Plaintiff's national origin was a motivating factor for the Corporation's Employment Practices.

76. But for the Corporation's wrongful Employment Practices, Plaintiff would not have been discriminated against based upon his national origin.

77. As detailed above, Plaintiff has suffered Damages as a result of Defendants' unlawful conduct under Count III.

**WHEREFORE**, on Count III, Plaintiff Joseph Gilbert respectfully requests that this Honorable Court enter judgment in his favor and against Defendant as follows:

a) Back pay (including interest and benefits) in an amount to be determined at trial;

b) Compensatory damages against the Defendant;

c) Plaintiff's attorney's fees, expert fees and costs incurred during and in connection with this matter pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1981a, and/or all other applicable state or federal laws;

d) Equitable relief to address Defendant's actions, including orders to prevent future re-occurrences of this conduct by requiring Defendant to create and follow lawful employment practices, and an order of front pay;

e) An award of punitive damages;

f) Pre- and post-judgment interest on the foregoing amounts; and

g) Any and all other relief that this Court deems just and proper.

### COUNT IV: VIRGINIA DISPARATE IMPACT DISCRIMINATION

78. Plaintiff hereby incorporates the preceding and subsequent paragraphs of this Complaint by reference in this Count.

79. Under the Virginia Human Rights Act, it is an "unlawful employment practice" to "discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's . . . national origin."  Va. Code § 2.2-3905(B).

80. Furthermore, it is an "unlawful employment practice" to "Limit, segregate, or classify employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect an individual's status as an employee, because of such individual's … national origin."  *Id.*

81. Defendant was Mr. Gilbert's employer for all purposes under the Virginia Human Rights Act.

## A.  Use of an Unlawful Employment Practice

82. By adopting the Employment Practices, the Corporation caused disparate impacts on workers of U.S. origin in violation of Virginia law, as detailed above.

83. On information and belief, there is no job-related reason for the Employment Practice.  The Corporation simply prefers to hire foreign workers for ulterior corporate benefits.

84. Nor is the Employment Practice justified by any business necessity.  For example, the Corporation could meet the prevailing wage requirements for Visa applicants, *and* avoid national origin discrimination or disparate impact, by adopting the Alternative Practices described above.

85. As detailed above, Plaintiff has been damaged as a result of Defendants' unlawful conduct under Count IV(A).

## B.  Refusal to Adopt Alternative Employment Practices

86. By refusing to adopt Alternative Practice 1, the Corporation engaged in an unlawful employment practice under Virginia law.

87. By refusing to adopt Alternative Practice 2, the Corporation engaged in an unlawful employment practice under Virginia law.

88. Failing to adopt Alternative Practices 1 and 2 has led to an unlawful disparate impact on people with a U.S. national origin, in violation of Virginia law.

89. As detailed above, Plaintiff has been damaged as a result of Defendants' unlawful conduct under Count IV(B).

90. **WHEREFORE**, Plaintiff Joseph Gilbert by Counsel, respectfully requests that this Honorable Court enter judgment in his favor on Count IV, and against Defendant as follows:

a) Back pay (including interest and benefits) in an amount to be determined at trial;

b) Compensatory damages against the Defendant;

c) Plaintiff's attorney's fees, expert fees and costs incurred during and in connection with this matter pursuant to Va. Code § 2.2-3908 and/or all other applicable state or federal laws;

d) Equitable relief to address Defendant's actions, including orders to prevent future re-occurrences of this conduct by requiring Defendant to create and follow lawful employment practices, and an order of front pay;

e) An award of punitive damages;

f) Pre- and post-judgment interest on the foregoing amounts; and

g) Any and all other relief that this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Dated: June 30, 2021                    **JOSEPH GILBERT**

By Counsel:

*K. Craig Welkener*

Timothy P. Bosson, Esq. (VSB: 72746)
K. Craig Welkener, Esq. (VSB: 94493)

- 15 -

Robert Rose, Esq. (VSB: 81240)
Bosson Legal Group, PC
8300 Arlington Blvd., Ste. B2
Fairfax, Virginia 22031
tbosson@bossonlaw.com
cwelkener@bossonlaw.com
rrose@bossonlaw.com
Phone (571) 775-2529
Fax (571) 775-2521

*Counsel for Plaintiff*